**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MALIKIE INNOVATIONS LTD. and KEY PATENT INNOVATIONS LTD.,<br><br>Plaintiffs,<br><br>v.<br><br>UBIQUITI INC. f/k/a UBIQUITI NETWORKS, INC.,<br><br>Defendant. | Civil Action No. 1:26-cv-11017<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT AND JURY DEMAND**

Plaintiffs Malikie Innovations Ltd. ("Malikie") and Key Patent Innovations Ltd. ("KPI") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this Complaint for patent infringement and damages against Defendant Ubiquiti Inc. f/k/a Ubiquiti Networks, Inc. ("Ubiquiti" or "Defendant") and, in support, allege the following:

**PARTIES**

1. Plaintiff Malikie is the successor-in-interest to a substantial patent portfolio created and procured over many years by BlackBerry Ltd., formerly known as Research in Motion Ltd., and its predecessor, subsidiary, and affiliated companies (collectively, "BlackBerry"). Malikie is an Irish entity duly organized and existing under the laws of Ireland. Malikie has registered offices at: The Glasshouses GH2, 92 Georges Street Lower, Dun Laoghaire, Dublin A96 VR66, Ireland.

2. Plaintiff KPI is the beneficiary of a trust pursuant to which Malikie owns, holds, and asserts the Asserted Patents (set forth below). KPI is an Irish entity duly organized and existing under the laws of Ireland. KPI has registered offices at: The Glasshouses GH2, 92 Georges Street Lower, Dun Laoghaire, Dublin A96 VR66, Ireland.

3. On information and belief, Defendant Ubiquiti, Inc. ("Ubiquiti") is a corporation duly organized and existing under the laws of the State of Delaware, with a principal place of business at: 685 3rd Ave, Ste 27, New York, NY 10017 (with 6,500 sq. ft. of leased space it uses for "Corporate Office") and a regular and established place of business in Chicago, IL (including 31,000 sq. ft. of leased space it uses for "Corporate Office & R&D").[1]

4. On information and belief, Defendant owns and operates the website at www.ui.com.

5. Defendant sells, offers for sale, and/or imports into the United States products that utilize Wi-Fi, Wi-Fi direct, and AV1 technologies, including but not limited to access points and security cameras.

6. On information and belief, as of September 9, 2026, Defendant's website for Careers lists three job postings for its Chicago location, including one for "Pre-Sales Engineer" in its Research and Development department, another for "Rapid Response Support Specialist" in its Operations department, and a third for "Senior Manager, Treasury" in its General and Administration department.[2]

7. On information and belief, Defendant and/or its employees or officers direct and/or control the actions of its direct and indirect subsidiaries. On information and belief, Defendant and/or its employees or officers direct and/or control the actions of these entities by, for example, inducing and contributing to the actions complained of herein.

---

[1] https://ir.ui.com/sites/ubiquiti-ir/files/2026-08/ui-06-30-2026-10k-2026.pdf; https://www.sec.gov/ix?doc=/Archives/edgar/data/0001511737/000151173726000056/ubnt-20260630.htm.

[2] https://careers.ui.com/; https://careers.ui.com/apply/Pre-Sales_Engineer--4210818009; https://careers.ui.com/apply/Rapid_Response_Support_Specialist--4290512009; https://careers.ui.com/apply/Senior_Manager%2C_Treasury--4396207009.

8. Defendant and its affiliates regularly contract with customers regarding products made for or on behalf of those customers.

## PATENTS IN SUIT

9. Malikie is the assignee of and owns all right and title to U.S. Patent Nos. 7,747,934 (the "'934 Patent"); 9,615,311 (the "'311 Patent); 9,615,383 (the "'383 Patent"); and 10,778,989 (the "'989 Patent") (collectively, the "Asserted Patents").

10. BlackBerry developed numerous innovative and diverse technologies, including groundbreaking inventions pertaining to mobile devices and related software and wireless communications technology. Some of these groundbreaking inventions are described and claimed in certain of the Asserted Patents.

11. The '934 Patent, entitled "Method for selecting low density parity check (LDPC) code used for encoding of variable length data" was duly and lawfully issued on June 29, 2010. A true and correct copy of the '934 Patent is attached hereto as Exhibit 1.

12. The '311 Patent, entitled "Methods and Apparatus for the Communication of Cellular Network Information Between a Wireless Local Area Network and a Mobile Station" was duly and lawfully issued on April 4, 2017. A true and correct copy of the '311 Patent is attached hereto as Exhibit 2.

13. The '383 Patent, entitled "Negotiation of Quality of Service (QoS) Information for Network Management Traffic in a Wireless Local Area Network (WLAN)" was duly and lawfully issued on April 4, 2017. A true and correct copy of the '383 Patent is attached hereto as Exhibit 3.

14. The '989 Patent, entitled "Rolling intra prediction for image and video coding" was duly and lawfully issued on September 15, 2020. A true and correct copy of the '989 Patent is attached hereto as Exhibit 4.

15. BlackBerry sent Ubiquiti a letter on or about March 18, 2021 identifying patents, including the ’311 Patent, and a set of exemplary Ubiquiti products and services that BlackBerry believed are and/or were infringing, on a patent-by-patent basis.

16. Malikie sent a letter dated October 4, 2023, addressed to Ubiquiti’s CEO, offering a license to Malikie’s patent portfolio. Malikie’s letter included the ’311 Patent, as well as a set of exemplary Ubiquiti products or services that Malikie believed are and/or were infringing, again on a patent-by-patent basis. Malikie’s letter also specifically noted that its portfolio included patents relating to the IEEE 802.11 (Wi-Fi) and Wi-Fi Alliance Passpoint standards and that Malikie is willing to offer Ubiquiti a license so that it could continue its use of the patented technologies. The October 4, 2023 letter was sent via courier mail and e-mail. No one at Ubiquiti responded to Malikie.

17. Malikie followed up with Ubiquiti, on or about November 3, 2023, December 6, 2023, December 13, 2023, January 29, 2024, February 1, 2024, April 19, 2024, April 22, 2024, May 9, 2025, March 21, 2025, and June 11, 2026. Malikie also sent an additional correspondence, via courier mail and e-mail, on or about September 13, 2024, which identified a rate at which Ubiquiti could license Malikie’s standards-essential patents.

18. Malikie sent an additional letter, via courier mail and e-mail, on or about May 9, 2025, which identified additional patents, including the ’383 Patent. Malikie’s communications included a request for a call or meeting to discuss Malikie’s patent portfolio and possible licensing terms. Ubiquiti never responded.

19. As no one from Ubiquiti or acting on Ubiquiti’s behalf ever responded to Malikie’s numerous outreaches, Malikie has been left with no choice but to bring this action to enforce its rights as the owner of valid and valuable patents that Ubiquiti is willfully infringing.

**IEEE 802.11 STANDARDS AND PLAINTIFFS' FRAND OBLIGATIONS**

20. The Institute of Electrical and Electronics Engineers ("IEEE") is a professional association that, among other activities, develops and publishes technical standards across a wide range of fields, including telecommunications and wireless communications.

21. The IEEE-Standards Association ("IEEE-SA") is the standards development organization within the IEEE responsible for developing and maintaining consensus-based standards in various industries, including the IEEE 802.11 family of wireless networking standards (commonly known as "Wi-Fi"). The IEEE 802.11 standards define specifications for the medium access control ("MAC") and physical ("PHY") layers to enable interoperable wireless local area network implementations. The IEEE-SA requires participants in its standards development process to comply with its patent policy, which governs the disclosure and licensing of patent rights that may be essential to the implementation of an IEEE standard. Participants are required to disclose the existence of patents or pending patent applications that they believe may contain claims essential or potentially essential to a proposed or approved standard. When such disclosure is made, the patent holder is requested to submit a Letter of Assurance ("LOA") stating whether it is willing to grant licenses to implementers of the relevant standard under terms that are fair, reasonable, and non-discriminatory ("FRAND"), consistent with the IEEE-SA patent policy.

22. BlackBerry participated actively in the IEEE standards development process, including the development of numerous standards within the 802.11 family. On multiple occasions, BlackBerry submitted public LOAs to the IEEE-SA stating that it may own patents containing Essential Patent Claims with respect to certain IEEE 802.11 standards, including the IEEE 802.11-2012, 802.11k, 802.11mb, 802.11n, 802.11p, 802.11r, 802.11s, 802.11u, 802.11v, 802.11w, 802.11y, 802.11z, 802.11aa, 802.11ad, and 802.11ae standards. In those LOAs,

BlackBerry further indicated that it was willing to grant licenses under any patents containing Essential Patent Claims on terms that are FRAND.

23. The IEEE Patent Policy and FRAND framework make clear that FRAND negotiations require a reciprocal duty of the SEP holder (Submitter) and licensee (Applicant) to engage in good faith negotiations without unreasonable delay, or alternatively, litigate. Section 6.2 of the current IEEE bylaws states:

> The Submitter and the Applicant should engage in good faith negotiations (if sought by either party) without unreasonable delay or may litigate … over patent validity, enforceability, essentiality, or infringement; Reasonable Rates or other licensing terms and conditions; compensation for unpaid past royalties or a future royalty rate … § 6.2.

24. As detailed above, BlackBerry and Malikie offered Ubiquiti the opportunity to license its SEPs, including those covering IEEE 802.11 standards. BlackBerry notified Ubiquiti of its infringement of the ’311 Patent on March 18, 2021. Malikie re-notified Ubiquiti of its infringement of the ’311 Patent on October 4, 2023 and notified it of the ’383 Patent on May 9, 2025. On or about September 13, 2024, Malikie offered a specific FRAND royalty rate for all patents essential to the IEEE 802.11 standards and a specific FRAND royalty rate for all patents essential to the Wi-Fi Alliance and Passport standards (as discussed further below). Ubiquiti did not respond to any of BlackBerry or Malikie’s communications.

**<u>WI-FI ALLIANCE AND PASSPOINT</u>**

25. Wi-Fi Alliance is an organization including a network of companies that focus on Wi-Fi technology. Wi-Fi Alliance helped develop the Passpoint protocol and its standard. The Passpoint protocol allows devices to discover and authenticate Wi-Fi access points that provide network access. Wi-Fi Alliance requires any member or affiliate that makes a contribution to a

specification[3] or participates to grant implementer members a license to patent(s) that are necessarily infringed by implementing relevant portions of a specification (e.g., Passpoint) under reasonable and nondiscriminatory terms. BlackBerry is a member that has contributed to the Passpoint specification.

26. As mentioned above, Malikie offered Ubiquiti the chance to license its SEPs, including those covering the Wi-Fi Alliance Passpoint standard, under FRAND terms. Particularly, BlackBerry contacted Ubiquiti on or about March 18, 2021, to notify Ubiquiti of its infringement of numerous patents, including the ’311 Patent. Malikie then contacted Ubiquiti and its representatives on or about October 4, 2023, and then again on each of November 3, 2023, December 6, 2023, December 13, 2023, January 29, 2024, February 1, 2024, April 19, 2024, April 22, 2024, September 13, 2024, May 9, 2025, March 21, 2025, and June 11, 2026 regarding its infringement of numerous patents, including the Asserted Patents. In its September 13, 2024 correspondence, Malikie offered a specific reasonable royalty rate for all patents essential to the Wi-Fi Alliance Passpoint standard or that otherwise fall within the commitments to Wi-Fi Alliance made by the owner of the patents at the time. Ubiquiti did not respond to any of BlackBerry or Malikie’s communications.

**<u>JURISDICTION AND VENUE</u>**

27. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of their Complaint.

28. This civil action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including without limitation 35 U.S.C. §§ 271, 281, 283, 284, and 285. Thus, this is a patent

---

[3] Wi-Fi Alliance defines specification as “any of the following once adopted and approved for release by the Corporation’s Board of Directors: (a) technical specification, (b) test tool, (c) test plan, and (d) certification program.” https://www.wi-fi.org/system/files/gd_8_RevisedMarch1%2C2006WFAIPRPolicy.pdf.

infringement lawsuit over which this Court has subject matter jurisdiction under, *inter alia*, 28 U.S.C. §§ 1331, 1332, and 1338(a).

29. This Court has general and specific personal jurisdiction over Defendant because, directly and/or through intermediaries, Defendant has committed acts within this District giving rise to this action; transacts and conducts business, directly and/or indirectly, in this District and the State of Illinois; transacts and conducts business with residents of this District and the State of Illinois; and is located in this District.

30. Plaintiffs' causes of action arise, at least in part, from Defendant's contacts with and activities in and/or directed at this District and the State of Illinois.

31. Defendant has infringed the Asserted Patents and continues to infringe the '934, '383, and '989 Patents within this District and the State of Illinois by making, using, selling, offering for sale, and/or importing in or into this District and elsewhere in the state, products and services covered by claims of the Asserted Patents, including without limitation products that, when made or used, practice one or more claims of each Asserted Patent. Defendant, directly and/or through intermediaries, makes, uses, sells, licenses, offers for sale, imports, ships, distributes, advertises, promotes, and/or otherwise commercializes such infringing products and services in or into this District and the State of Illinois. Defendant regularly conducts and solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from goods and services provided to residents of this District and the State of Illinois.

32. Defendant is doing business, directly and/or through respective agents, on an ongoing basis in this judicial District and elsewhere in Illinois and the United States, and has committed acts of infringement in this District. Plaintiffs' causes of action arise, at least in part,

from Defendant's contacts with and activities in and/or directed to this District and the State of Illinois.

33. On information and belief, Defendant makes, uses, sells, offers to sell, and/or imports infringing products into and/or within this District, maintains a permanent and/or continuing presence within this District (including in its Chicago office), and has the requisite minimum contacts with this District such that this venue is a fair and reasonable one. On information and belief, Defendant has transacted and, at the time of the filing of the Complaint, is continuing to transact business within this District.

## FIRST CLAIM

### (Infringement of the '934 Patent)

34. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of their Complaint.

35. The '934 Patent is generally directed to selecting a low-density parity-check (LDPC) code used for encoding variable sized data. The claims of the '934 Patent are directed to non-abstract ideas and otherwise recite inventive concepts and technological improvements.

36. The '934 Patent includes improvements to an existing technological process (e.g., selecting an LDPC code) and improvements to the performance of a computer system itself (e.g., a wireless communication system). For example, the specification discloses: "[o]ne problem when using LDPC codes is a necessity to properly adjust the encoding procedure due to variable payload size and due to variable underlying transmission mechanism. Such encoding procedure typically assumes usage of shortening and puncturing techniques. Furthermore, there may be a plurality of LDPC codes with different codeword lengths and code rates available. The number of the possible combinations may present a challenge to select the appropriate LDPC code to provide a suitable

coding gain, and at the same time minimize the number of encoded packets, codewords and modulated symbols." Exhibit 1 ('934 Patent) at 1:66-2:9. The '934 Patent addressed these problems through improvements in selecting an LDPC code for variable sized data as disclosed in at least claim 1: "[a] method for selecting a low-density parity-check (LDPC) code used for encoding variable sized data … encoding data using the selected LDPC code."

37. The '934 Patent teaches another example of an improvement in selecting an LDPC code for variable sized data: "these [known] methods do not directly address the problem described earlier: apply shortening and puncturing in such a way that the code rate is approximately the same as the original one, and the coding gain is preserved. One method attempting to solve this problem specifies shortening and puncturing such that the code rate of the original code is preserved." *Id.* at 7:17-23. The specification discloses how the ordered combination of calculating a number of shortening bits and a number of puncturing bits when selecting an LDPC code provides a significant improvement to the performance of the wireless communication system at the time of the invention. For example, the specification discloses the advantages of shortening "[i]n the case of a column regular parity check matrix, or more generally, approximately regular or regular and approximately regular only in the data part of the matrix, H, the method described in the previous paragraph is still preferred compared to the existing random or periodic/random approach. The method described here ensures approximately constant row weight, which is another advantage from the performance and the implementation complexity standpoint." *Id.* at 9:57-59. Improvements in selecting an LDPC code using shortening are disclosed in at least claim 1: "calculating a number of shortening $N_{shortened}$ bits for each of the plurality of LDPC codes; … determining, in a computer processor, a selected LDPC code from the plurality of shortened LDPC codes," dependent claim 3: "herein the performance criterion is selected from the group consisting

of … a range of $N_{shortened}$," and dependent claim 4: "wherein the performance criterion is selected from the group consisting of … a maximum for $N_{shortened}$."

38. Another example of the advantages of the ordered combination of calculating a number of shortening bits and a number of puncturing bits when selecting an LDPC code is disclosed in *id*. at 10:61-11:1, with reference to the performance curves of Fig. 9: "[a]mong all of those [performance curves], it appears that for the particular matrix structure (irregular $H_d$ part with the modified dual diagonal in the $H_p$ part) the best results are obtained when both criteria [shortened bits and punctured bits] are taken into account, as represented by curves 242, 243, 245, 246. Among all of those, it appears that for the particular matrix structure (irregular $H_d$ part with the modified dual diagonal in the $H_p$ part) the best results were obtained when the punctured bits were selected from those corresponding to the weak columns of the data part of the parity check matrix, $H_d$." Improvements in selecting an LDPC code using puncturing are disclosed in at least claim 1: "calculating a number of puncturing $N_{punctured}$ bits for each of the plurality of LDPC codes; … determining, in a computer processor, a selected LDPC code from the plurality of shortened LDPC codes and the plurality of punctured LDPC codes meeting the performance criterion," dependent claim 3: "wherein the performance criterion is selected from the group consisting of … a range of $N_{punctured}$," and dependent claim 4: "wherein the performance criterion is selected from the group consisting of … a minimum for $N_{punctured}$,"

39. Another example of the advantages of the ordered combination of calculating a number of shortening bits and a number of puncturing bits when selecting an LDPC code is based on a ratio of shortening to puncturing bits. For example, "the shortening-to-puncturing ratio can be chosen such that it guarantees preservation of the performance level of the original code." *Id*. at 11:11-13. Further, the specification discloses that a normalized shortening to puncturing ratio,

$q_{normalized}$ can be used to reduce complexity and preserve performance "if the goal is to preserve performance, this normalized ratio must be greater than one: $q_{normalized}>1$. It was found through much experimentation that $q_{normalized}$ in the range of 1.2-1.5 complies with the performance preserving requirements." *Id.* at 11:19-23. Improvements in selecting an LDPC code based on a shortening-to-puncturing ratio are disclosed in at least claim 1: "determining, in a computer processor, a selected LDPC code from the plurality of shortened LDPC codes and the plurality of punctured LDPC codes meeting the performance criterion," dependent claim 3: "wherein the performance criterion is selected from the group consisting of … a range for normalized shortening to puncturing ratio, $q_{normalized}$," and dependent claim 4: "wherein the performance criterion is selected from the group consisting of … a maximum for normalized shortening to puncturing ratio, $q_{normalized}$."

40. Another example of the significant improvement to LDPC coding methods claimed by the invention is the use of an ordered combination of claim elements to meet a performance criteria: "[t]he LDPC codes with different lengths and code rates generally result in a plurality of possible coding options, from which a coding option may be chosen based on the criteria as described above, namely: (a) Keep the performance i.e. the coding gain as high as possible; (b) Use as few modulated symbols as possible; and (c) Keep the overall complexity at a reasonable level." *Id.* at 12:26-34. Criteria (a) "the coding gain as high as possible" results in the improvement of reducing the bit error rate in the wireless communication, thereby increasing its efficiency and performance. Criteria (b) results in an improvement in reduced transmit power and increased bandwidth (more bits per second). Criteria (c) results in reduced CPU cycles, thereby reducing network latency and increasing battery life.

41. Defendant, under 35 U.S.C. § 271(a), has directly infringed, and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claims 1 and 10 of the ’934 Patent, by making, using, testing, selling, offering for sale, and/or importing hardware and/or software including devices compliant with IEEE 802.11 standards (excluding any products licensed under the ’934 Patent), such as any of Defendant’s product implementing LDPC, such as Ubiquiti UC-Cast-Lite, UAP-AC-M-PRO, UAP-AC-IW, UAP-AC-LITE, UAP-IW-HD, UAP-AC-PRO, UAP-AC-PRO, UAP-AC-M, UAP-nanoHD, Unifi Express Gateway, U6-Lite, U6-Pro, U7-Pro, E7, E7 Campus, and E7 Audience, as identified in Exhibit 5. An exemplary claim chart showing one way in which Defendant infringes claims 1 and 10 of the ’934 Patent is attached as Exhibit 5.

42. Defendant is also indirectly infringing the ’934 Patent under 35 U.S.C. § 271(b) and (c).

43. Defendant is knowingly, intentionally, and actively aiding, abetting, and inducing others to directly infringe, at least as of the filing of the Complaint, at least claims 1 and 10 of the ’934 Patent, by, for example, selling and offering access to devices compliant with IEEE 802.11 standards. Defendant is knowingly, intentionally, and actively aiding, abetting, and inducing others to directly infringe at least claims 1 and 10 of the ’934 Patent by, for example, selling, offering for sale, and encouraging customers to use at least some or all of the infringing products. Defendant, for example, provides instructions on how to access and use the infringing Wi-Fi features. *See* Exhibit 5.

44. Defendant is contributing to the direct infringement, at least as of the filing of the Complaint, of at least claims 1 and 10 of the ’934 Patent under 35 U.S.C. § 271(c), by, for example, supplying, with knowledge of the ’934 Patent, a material part of a claimed invention, where the

material part is not a staple article of commerce and is incapable of substantial noninfringing use. For example, Defendant provides, owns, operates, sells, offers to sell, and/or imports devices compliant with IEEE 802.11 standards (such as those shown in Exhibit 5) that are not staple articles of commerce and are incapable of substantial non-infringing use.

**SECOND CLAIM**

**(Infringement of the '311 Patent)**

45. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of their Complaint.

46. The '311 Patent is generally directed to a method and apparatus for the communication of cellular network information between a wireless local area network (WLAN) (e.g., Wi-Fi) and a mobile station. The claims of the '311 Patent are directed to non-abstract ideas and otherwise recite inventive concepts and technological improvements.

47. The '311 Patent includes improvements to an existing technological process (e.g., communication of cellular network information) and improvements to the performance of a computer system itself (e.g., a wireless communication system). For example, the specification discloses a problem existing in wireless networks at the time of the invention: "[t]raditionally, since WLANs were designed to provide only wireless local networking, there have been no existing protocols to provide advertisements to identify what cellular networks are available to a mobile station." Exhibit 2 ('311 Patent) at 1:31-1:35. The specification further discloses the benefits of solving the problem: "[s]uch information would be useful to provide the mobile station with the ability to identify and switch between different cellular networks and/or cellular network technologies as desired." *Id.* at 1:35-1:38. The '311 Patent addressed these problems through improvements in communicating cellular network information to a WLAN device as disclosed in

at least claim 1: "obtaining by the WLAN, cellular network information … transmitting, from the WLAN to a mobile station, a generic container … including at least one MNC and MCC pair that indicates at least one 3GPP network."

48. The '311 Patent teaches another example of an improvement in improvements in communicating cellular network information to a WLAN device: "the mobile station receives a generic container message from the WLAN in an extensible authentication procedure (EAP). The generic container message includes cellular network information associated with one or more available cellular networks previously received by the WLAN. The generic container message is not technology or standard-specific and therefore it may contain cellular network information from a variety of different cellular networks . The mobile station decodes the generic container message to identify and store the cellular network information in its memory. Preferably, the cellular network information includes information which identifies the cellular networks (e.g. mobile network code and mobile country code) so that the mobile station may appropriately select one of the cellular networks for communication." *Id.* at 11:61-12:9. The specification discloses how transmitting the generic container using Extensible Authentication Protocol (EAP) and including the MCC/MNC pairs provides automatic selection of a cellular network: "[t]hus, the EAP with receipt of the generic container message having MCC/MNC pairs takes place of a conventional scanning operation of the mobile station for cellular network selection. Thus, the mobile station provides the automatic or manual selection of the network during the EAP through the WLAN based on the received MCC/MNC pairs." *Id.* at 10:60-66. The improvement to the communications network includes enabling automatic switching between cellular networks (e.g., roaming) and switching between Wi-Fi and cellular as disclosed in at least claim 1: "the container field including at least one of: neighboring cellular channels or at least one MNC and MCC pair

that indicates at least one 3GPP network, the at least one MNC/MCC pair for use by the mobile station to select a 3GPP network to access."

49. Defendant has been on notice of the '311 Patent and a specific factual basis for its infringement of the '311 Patent since at least March 18, 2021. On information and belief, Defendant never took any action to stop its infringement.

50. Defendant has, under 35 U.S.C. § 271(a), directly infringed, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the '311 patent, by having made, used, tested, sold, offered for sale, and/or imported hardware and/or software including devices compliant with the Wi-Fi Alliance Passpoint standard (excluding any products licensed under the '311 Patent), such as the Unifi AC Pro, Unifi U6 Plus, and Unifi U7 Pro. An exemplary claim chart concerning one way in which Defendant infringed claim 1 of the '311 patent is attached as Exhibit 6.

51. Defendant has also indirectly infringed the '311 Patent under 35 U.S.C. § 271(b) and (c).

52. Defendant has knowingly, intentionally, and actively aided, abetted, and induced others to directly infringe at least claim 1 of the '311 Patent, by, for example, selling and offering access to its products and services. *See* Exhibit 6.

53. Defendant has also contributed to the direct infringement of at least claim 1 of the '311 Patent under 35 U.S.C. § 271(c) by, for example, supplying, with knowledge of the '311 Patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial noninfringing use. For example, Defendant provided, owned, operated, sold, offered to sell, and/or imported products or software, including devices that

implement the Wi-Fi Alliance Passpoint standard (such as those shown in Exhibit 6), that were not staple articles of commerce and were incapable of substantial noninfringing use.

54. Defendant's infringement has been willful in view of the above and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

**THIRD CLAIM**

**(Infringement of the '383 Patent)**

55. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of their Complaint.

56. The '383 Patent is generally directed to a method for handling network management traffic in wireless local area networks (WLANs) (e.g., Wi-Fi). The claims of the '383 Patent are directed to non-abstract ideas and otherwise recite inventive concepts and technological improvements.

57. The '383 Patent includes improvements to an existing technological process (e.g., transmitting management frames in a wireless network) and improvements to the performance of a computer system itself (e.g., a wireless communication system). For example, the specification discloses a problem existing in wireless networks at the time of the invention in which management frames are to be transmitted with highest priority: "[m]anagement frames are the foundation of network management traffic in a Wireless Local Area Network (WLAN). Current IEEE 802.11 standards dictate that, in any access point (AP) or non-AP station (STA), management frames are to be handled via the EDCA queue of highest priority." Exhibit 3 ('383 Patent) at 1:41-1:45. The specification further describes the problem of transmitting management frames with the highest priority: "[i]f all management frames continue to be handled as frames of the highest priority, this

may adversely affect overall network performance or the ability to provide Quality of Service (QoS) to data frames or both. For example, it would not be desirable for the transmission of diagnostic reports to reduce the quality of a voice call." *Id*. at 2:45-50. The specification further describes the problem of transmitting management frames with the highest priority: "[c]onventionally, management frames, in contrast to data frames, do not have an indication of priority, so there is no inherent classification of a management frame to an access category." *Id*. at 3:37-40. The specification discloses a solution: "the present disclosure describes the implementation of prioritization scheme(s) that define various access categories of different management frames, where each of the access categories is associated with a respective prioritization used for transmission. An access category may be defined for a group of management frame subtypes or for an individual management frame subtype." *Id*. at 2:53-60. The solution is disclosed in claim 1: "transmitting a management frame quality of service (MFQ) policy configuration request to an access point … receiving, from the access point, a MFQ policy configuration response … transmitting any subsequent management frames to the access point in accordance with the change to the MFQ policy."

58. Defendant has been on notice of the '383 Patent and a specific factual basis for its infringement of the '383 Patent since at least May 9, 2025. On information and belief, Defendant has not taken any action to stop its infringement.

59. Defendant has, under 35 U.S.C. § 271(a), directly infringed, and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 7 of the '383 patent, by having made, used, tested, sold, offered for sale, and/or imported hardware and/or software including devices that implement the 802.11 standards (excluding any products licensed under the '383 Patent), such as Unifi AC Pro and Unifi

U6 Pro. An exemplary claim chart concerning one way in which Defendant infringes claim 1 of the ’383 patent is attached as Exhibit 7.

60. Defendant has also indirectly infringed, and continues to indirectly infringe, the ’383 Patent under 35 U.S.C. § 271(b) and (c).

61. Defendant has knowingly, intentionally, and actively aided, abetted, and induced others to directly infringe at least claim 7 of the ’383 Patent, and continues to do so, by, for example, selling and offering access to its products and services. *See* Exhibit 7.

62. Defendant has also contributed to the direct infringement of at least claim 7 of the ’383 Patent under 35 U.S.C. § 271(c), and continues to do so, by, for example, supplying, with knowledge of the ’383 Patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial noninfringing use. For example, Defendant provides, owns, operates, sells, offers to sell, and/or imports products or software, including devices that implement the 802.11 standards (such as those shown in Exhibit 7), that are not staple articles of commerce and are incapable of substantial noninfringing use.

63. Defendant’s infringement has been willful in view of the above and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

## FOURTH CLAIM

### (Infringement of the ’989 Patent)

64. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of their Complaint.

65. The ’989 Patent is generally directed to a method for encoding a video to produce a bitstream. The claims of the ’989 Patent are directed to non-abstract ideas and otherwise recite inventive concepts and technological improvements.

66. The ’989 Patent includes improvements to an existing technological process (e.g., encoding video) and improvements to the performance of a computer system itself (e.g., improving the efficiency of pixel intra prediction). For example, the specification discloses a problem existing in video encoding at the time of the invention: “[h]owever, linear displacement-based spatial prediction reliant upon neighboring previously-reconstructed pixels may not be the most efficient or effective mechanism for performing intra prediction.” Exhibit 4 (’989 Patent) at 1:49-52. The specification discloses an improvement to the intra-prediction process: “[t]he present application describes a modified intra prediction process that may reduce the likelihood of such discontinuities. Advantageously, some embodiments of the below-described modified intra prediction process are independent of the reconstruction of the corresponding residual block at the decoder. Such independency allows for parallel processing of prediction generation and residual block reconstruction.” *Id*. at 5:7-15. An improvement to the intra-prediction process is further disclosed in claim 10: “selecting a template from among a plurality of templates based on a traversing order, wherein the template specifies relative locations of three or more nearby pixels to be used as inputs to the prediction function for a particular pixel.”

67. Defendant has, under 35 U.S.C. § 271(a), directly infringed, and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 10 of the ’989 Patent, by making, using, testing, selling, offering for sale, and/or importing cameras that support AV1 video encoding (collectively, the “’989

Accused Products"). An exemplary claim chart concerning one way in which Defendant infringes claim 1 of the '989 Patent is attached as Exhibit 8.

68. Defendant is also indirectly infringing the '989 Patent under 35 U.S.C. § 271(b) and (c).

69. Defendant is knowingly, intentionally, and actively aiding, abetting, and inducing others to directly infringe, at least as of the filing of the Complaint, at least claim 10 of the '989 Patent, by, for example, selling and offering access to devices that support AV1 video encoding. Defendant is knowingly, intentionally, and actively aiding, abetting, and inducing others to directly infringe at least claim 10 of the '989 Patent by, for example, selling, offering for sale, and encouraging customers to use at least some or all of the '989 Accused Products to capture AV1 encoded video. Defendant, for example, advertises AV1 encoding capabilities in its product marketing materials and provide instructions on how to enable AV1 encoding on the '989 Accused Products.

70. Defendant is also contributing to the direct infringement, at least as of the filing of the Complaint, of at least claim 10 of the '989 Patent under 35 U.S.C. § 271(c), and continues to do so, by, for example, supplying, with knowledge of the '989 Patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial noninfringing use. For example, Defendant provides, owns, operates, sells, offers to sell, and/or imports AV1-capable video encoding hardware in the '989 Accused Products that was not a staple article of commerce and was incapable of substantial noninfringing use.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

A. That Defendant has infringed the Asserted Patents, and unless enjoined, will continue to infringe the ’934, ’383, and ’989 Patents;

B. That Defendant’s infringement of the ’311 and ’383 Patents has been willful;

C. That Defendant pay Plaintiffs damages adequate to compensate for its past infringement of each of the Asserted Patents, and present and future infringement of the ’934, ’383, and ’989 Patents, together with interest and costs under 35 U.S.C. § 284;

D. That Defendant pay prejudgment and post-judgment interest on the damages assessed;

E. That Defendant pay Plaintiffs enhanced damages pursuant to 35 U.S.C. § 284;

F. That Defendant be enjoined from infringing the ’934, ’383, and ’989 Patents, or if its infringement is not enjoined, that Defendant be ordered to pay ongoing royalties to Plaintiffs for any post-judgment infringement of the ’934, ’383, and ’989 Patents;

G. That this is an exceptional case under 35 U.S.C. § 285; and that Defendant pay Plaintiffs’ attorneys’ fees and costs in this action; and

H. That Plaintiffs be awarded such other and further relief, including equitable relief, as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Malikie and KPI hereby demand a trial by jury on all issues triable to a jury.

Dated: September 10, 2026

Respectfully submitted,

By: */s/ Timothy E. Grochocinski*

Patrick Colsher
Khue Hoang
REICHMAN JORGENSEN LEHMAN
& FELDBERG LLP
650 Fifth Avenue, Suite 2320
New York, NY 10019
Telephone: (212) 381-1965
pcolsher@reichmanjorgensen.com
khoang@reichmanjorgensen.com

Matthew G. Berkowitz
REICHMAN JORGENSEN LEHMAN
& FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Telephone: (650) 623-1401
mberkowitz@reichmanjorgensen.com

Naveed Hasan (*pro hac vice* forthcoming)
REICHMAN JORGENSEN LEHMAN
& FELDBERG LLP
1909 K Street N.W., Suite 800
Washington, DC 20006
Telephone: (202) 894-7310
nhasan@reichmanjorgensen.com

Timothy E. Grochocinski
Illinois Bar No. 6295055
tim@nelbum.com
C. Austin Ginnings
Illinois Bar No. 6343678
austin@nelbum.com
Taryn N. Trusty
Illinois Bar No. 6344409
taryn@nelbum.com
NELSON BUMGARDNER CONROY PC
745 McClintock Drive, Suite 340
708.675.1974 (telephone)

*Counsel for Plaintiffs*
*Malikie Innovations Ltd. and*
*Key Patent Innovations Ltd.*